1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10

11   IN RE SEAWAY COMPANY OF                CV 11-0336 PA (Ex)
     CATALINA, et al.
12                                          FINDINGS OF FACT AND
                                            CONCLUSIONS OF LAW
13

14

15

16

17

18

19          Plaintiffs-in-Limitation Seaway Company of Catalina and Catalina Freight Line

20   ("Plaintiffs-in-Limitation") filed a Complaint for Exoneration From or Limitation of

21   Liability on January 12, 2011.  (Docket No. 1.)   On January 20, 2011, claimants Michael

22   Avila, as an individual; Michael Avila, as the personal representative of the Estate of Penny

23   Avila; and the Estate of Penny Avila ("Claimants") filed their Answer and Claim.   On

24   November 17, 2011, the Court dismissed all of the Claimants' claims except for the Death

25   on the High Seas Act ("DOHSA") claim of Michael Avila ("Avila"), as the personal

26   representative of the Estate of Penny Avila.

27

28

1   The Parties filed Trial Briefs and exchanged proposed Findings of Fact and

2   Conclusions of Law.[1] On May 29, 2012 and May 30, 2012, the Court, sitting without a jury,

3   conducted a bench trial.  Having considered the materials submitted by the parties and

4   reviewing the evidence, the Court makes the following findings of fact and conclusions of

5   law pursuant to Federal Rule of Civil Procedure 52(a):

6   **I.      FINDINGS OF FACT**

7       **A.      THE BAYLINER**

8       1.      The private pleasure craft occupied by Henry Sanchez ("Sanchez") and Penny

9   Avila was a Bayliner Avanti model with Vessel Identification No. CF2138JU and with an

10  overall length of 28.66 feet ("the Bayliner").  The Bayliner was originally constructed in

11  1989.  (Stipulated Fact[2] No. 5.)

12      2.      Penny Avila's son, Michael Avila, owned the Bayliner.  (Stipulated Fact No.

13  6.)

14      3.      The Bayliner was composed of fiberglass; small fiberglass boats present a

15  poor radar signature.  (Stipulated Fact No. 66.)

16      4.      The Bayliner was not equipped with radar reflectors.  (Stipulated Fact No. 67.)

17      5.      The Bayliner was equipped with radar.  (Declaration of Michael Avila ("Avila

18  Decl.") 6:11–12.)

19      6.      On October 1, 2008, the Bayliner was equipped with red and green (port and

20  starboard) navigation lights on the bow and an all–round white navigation/anchor light.  The

21  Bayliner's light switch had three positions: (1) ANC, in which the all–around white

22

23  _____

24  [1]      The Court ordered the parties to review the other side's proposed Findings of Fact
    and Conclusions of Law and to mark them to indicate the particular factual assertions and

25  legal conclusions they disputed.  The facts that are in dispute on which the Court relies in
    reaching its conclusion are supported by the record.

26

27  [2]      The reference to "Stipulated Fact" shall mean those consecutively numbered
    stipulated facts that are collectively contained with the Stipulation of Admitted Facts

28  (Docket no. 90), which contains facts Nos. 1 to 46, and the Stipulation of Further Admitted
    Facts (Docket no. 143), which contains facts Nos. 47 to 83.

navigation/anchor light would be on; (2) NAV, in which the red and green (port and starboard) navigation lights and the all–around white navigation/anchor light would be on; and (3) OFF, in which no lights would be on.  (Stipulated Fact No. 27; Declaration of Eugene Hickey Jr. ("Hickey Decl.") 15:18–21.)

7.    The all–round white navigation/anchor light on the Bayliner, if energized, had a visible range of two miles.  (Hickey Decl. 11:10–11, 15:24–27.)

8.    The red and green (port and starboard) navigation lights on the Bayliner, if energized, had a visible range of one mile.  (Hickey Decl. 11:13–15, 15:24–27.)

**B.    TUG REBEL II AND BARGE ISLANDER**

9.    At all relevant times, Plaintiff-in-Limitation Seaway Company of Catalina owned and Plaintiff-in-Limitation Catalina Freight Line operated the tug REBEL II and the barge ISLANDER.  (Stipulated Fact Nos. 57 and 58.)

10.   The tug REBEL II, official number 519844, is a vessel registered under the laws of the United States, of 61 gross tons and an overall length of 61.8 feet.  It was originally constructed in 1969.  (Stipulated Fact No. 1.)

11.   The REBEL II was operating in waters governed by the International Regulations for the Prevention of Collisions at Sea ("COLREGS"), 33 U.S.C. §§ 1601-1608. (Stipulated Fact No. 7)

12.   The United States Coast Guard manning requirements for the tug REBEL II authorized a one–man operation of the tug REBEL II in both inland and international waters. (Hickey Decl.  28:6–8; Trial Transcript[3/] 55:10–13.)

13.   The barge ISLANDER, official number 294606, is a barge registered under the laws of the United States, of 326 gross tons with an overall length of 128 feet and a breadth of 38 feet.  The barge ISLANDER was originally constructed in 1964, and is used

---

[3/]    The reference to "Trial Transcript" shall mean those consecutively numbers pages that are contained with the Reporter's Transcript of Bench Trial Day 1, Tuesday, May 29, 2012, which contains page Nos. 1 to 222, and Reporter's Transcript of Bench Trial Day 2, Wednesday, May 30, 2012, which contains page Nos. 222 to 361.

by Catalina Freight to transport cargo between Santa Catalina Island ("Catalina Island") and the Port of Los Angeles.  (Stipulated Fact No. 2.)

14.     The barge ISLANDER was transporting cargo between Catalina Island and the Port of Los Angeles.  (Stipulated Fact No. 3.)

15.     The tug REBEL II was towing the barge ISLANDER astern at a distance of between 1,100 and 1,200 feet.  (Stipulated Fact No. 4.)

16.     The physical characteristics of the tug REBEL II when towing a barge do not allow for quick and dynamic movements.  This is particularly true for the barge ISLANDER, given that it has no means of independent propulsion separate and apart from the tug REBEL II.  (Declaration of Olimpio Scoto, Jr. ("Scoto Decl.") 8:12–16; Trial Transcript 44:3–8.)

17.     The radar of the tug REBEL II was on and in proper working order.  (Scoto Decl. 9:9–10.)

18.     The radar set on board the tug REBEL II was a Furuno 1832 that was purchased from Long Beach Marine and maintained and serviced by Neptune Electronics Inc.  (Stipulated Fact No. 59.)

19.     The equipment and machinery of the tug REBEL II and barge ISLANDER were functioning and in proper working order.  (Scoto Decl. 9:11–13; Declaration of John Amstutz ("Amstutz Decl.") 4:10–12.)

20.     The navigation lights on both the tug REBEL II and barge ISLANDER were on and in proper working order.  (Scoto Decl. 10:13–14; Amstutz Decl. 4:28 –5:1; Trial Transcript 70:14–23.)

21.     Plaintiffs-in-Limitation usually operated the tug REBEL II with two people, a licensed master and a deckhand.  (Scoto Decl. 6:8–10.)

22.     The tug REBEL II was originally constructed with only one wheelhouse, which is a standard design for ocean-going tugs.  (Stipulated Fact No. 60.)

23.     The tug REBEL II's upper wheelhouse was not original to the tug, but was added later to facilitate navigating the tug when in the harbor and while working alongside a

barge, permitting the operator to have better visibility down the side of the tug.  (Scoto Decl. 5:8–11, 6:22–24; Trial Transcript 55:16 –56:9, 208:6–23.)

24.     It is standard industry practice for operators of ocean-going tugs, such as the tug REBEL II, to station their lookouts in the lower wheelhouse.  (Scoto Decl. 6:14–21; Declaration of R. Russell Johnson ("Johnson Decl.") 4:27–5:1; Hickey Decl. 28:2–22; Trial Transcript 209:1–11.)

25.     On October 1, 2008, the lower wheelhouse of the tug REBEL II contained various navigational equipment and controls including an autopilot, magnetic compass, global positioning system, two radios, and a Furuno Model 1832 radar set.  The navigational equipment and controls in the upper wheelhouse was limited as it only had two radios, a Furuno Model 1832 radar set, and a remote steering hand stick control.  (Scoto Decl. 5:12–17; Amstutz Decl. 2:11–14.)

26.     The tug REBEL II's lower wheelhouse has a forward visibility (looking toward the bow) through five forward–facing windows, separated by support stanchions, providing approximately 180–degree visibility out the front of the tug.  (Stipulated Fact No. 61.)

27.     The view aft from the lower wheelhouse of the tug REBEL II was provided through a window on the starboard–aft bulkhead and a small, round porthole window on the aft–port bulkhead.  (Stipulated Fact No. 62.)

28.     If a target is acquired from the lower wheelhouse, any line of sight impediments in the lower wheelhouse of the tug REBEL II can be eliminated by moving around the lower wheelhouse to maintain constant tracking of the target.  (Scoto Decl. 7:13–16, 10:23–26; Amstutz Decl. 3:9–12; Johnson Decl. 8:2–6; Hickey Decl. 8:2–5, 9:14–23.)

29.     Leaving the doors fully open would increase visibility out of the port and starboard sides of the lower wheelhouse.  (Trial Transcript 28:13–18.)

30.     The upper wheelhouse of the REBEL II provides an unobstructed, 360-degree view of the horizon, as there are no bulkheads in the upper wheelhouse and with the

1  exception of narrow window support stanchions there are no blind spots or significant

2  impairments.  (Trial Transcript 45:23– 46:1; Avila's Exhibit 201.)

3      31.    The Furuno Model 1832 radar set, which was mounted in the lower

4  wheelhouse REBEL II, was not in compliance with federal regulations governing the

5  navigation equipment for an uninspected towing vessel the size of the REBEL II.  The

6  regulations are found in 33 CFR 164.72 (ii)(B).  (Avila's Exhibit No. 279 at 2.)

7      32.    The radar on the tug on the night in question was not in compliance with 33

8  CFR 164.72 for the following reasons:

9          (a)    the bearing discrimination was inadequate;

10          (b)    the maximum range setting was inadequate;

11          (c)    the screen size was 130 mm.  A minimum screen size of 180 mm was

12                 required;

13          (d)    the radar antenna was a 24-inch Radome.  At least a 4-foot-long slotted

14                 waveguide antenna was required.  (Avila's Exhibit No. 279 at 2.)

15      33.    The recreation of the collision demonstrated that there was no significant

16  difference between the compliant and the non-compliant radar when detecting a replica

17  Bayliner on the 3 mile range scale.  (Declaration of Samuel R. Pecota ("Pecota Decl.") 5:9-

18  17; 6:2-10.)

19      **C.**    **THE CREW**

20      34.    Captain Olimpio Scoto ("Captain Scoto") is the holder of a Coast

21  Guard–issued credential as a master of steam or motor vessels of not more than 1,600 gross

22  registered tons (Domestic tonnage), 3,000 gross tons (ITC tonnage) upon oceans, master of

23  towing vessels upon oceans and radar observer (unlimited).  (Stipulated Fact No. 9.)

24      35.    Captain Scoto was first licensed by the United States Coast Guard in 1973 and

25  has extensive experience in the ocean–going tug industry spanning approximately 40 years.

26  (Stipulated Fact No. 10.)

27

28

36.     John Amstutz ("Deckhand Amstutz") holds no Coast Guard–issued credentials nor any type of radar endorsement or radar observer certification, and has had no formal training in the use of vessel radar.  (Stipulated Fact Nos. 11 and 12.)

37.     Deckhand Amstutz had extensive experience as a deckhand.  He worked on two towing vessels for approximately 10 years and has been informally trained by Captain Scoto and other captains on deckhand duties and radar observation.  (Stipulated Fact No. 13.)

38.     The lower wheelhouse of the tug REBEL II is normally used by Captain Scoto for his lookout while the tug is underway in the transit between Catalina Island and the Port of Los Angeles.  (Scoto Decl. 6:14–16.)

39.     Captain Scoto stations his lookout in the lower wheelhouse of the tug REBEL II because he can more easily work with and confer with the dedicated lookout from that location.  The lower wheelhouse is quieter than the upper wheelhouse of the tug REBEL II which assists with Captain Scoto's communication with the dedicated lookout.  (Stipulated Fact No. 65; Scoto Decl. 6:17–21.)

40.     In all of Captain Scoto's years of experience and training, including interfacing with the United States Coast Guard, no one has ever told him that a prudent mariner, a captain, operating a tug at night with a tow coming into port, should station a lookout in the upper wheelhouse to visually look for small pleasure craft.  (Scoto Decl. 6:25–7:1.)

41.     The COLREGS are silent as to the precise position of where a lookout should be positioned.  (Trial Transcript 162:14–17.)

42.     Plaintiffs-in-Limitation issued written directions to Captain Scoto and Deckhand Amstutz to ensure that a proper lookout was maintained for small pleasure craft. (Scoto Decl. 8:17–20; Amstutz Decl. 3:20–22; Plaintiffs-in-Limitation's Exhibit Nos. 54 and 55.)

43.     Deckhand Amstutz usually works with Captain Scoto on the LA/LB Port-Catalina runs and had done so for approximately 6 years at the time of the accident.

(Stipulated Fact Nos. 13 and 15.)

44.    Plaintiffs–In–Limitation reasonably determined that Captain Scoto and Deckhand Amstutz were suitably qualified and experienced to operate the tug REBEL II. (Stipulated Fact No. 63.)

45.    Plaintiffs-in-Limitation had no reason to believe that Captain Scoto and Deckhand Amstutz would not otherwise be actively engaged in performing proper lookout duties, or that Captain Scoto would not observe the radar properly.  (Declaration of Richard Coffey ("Coffey Decl.") 7:16–19.)

**D.    THE Captain T LE**

46.    On the night of October 1, 2008, and morning of October 2, 2008, the Captain T LE, a crewboat that runs back and forth from Long Beach to the oil platforms, was transiting the area outbound from Los Angeles/Long Beach Harbor in the precautionary area. (Stipulated Fact No. 29.)

47.    Prior to the Collision, the Bayliner passed directly in front of the Captain T LE at a speed of 20 knots at a range of approximately 0.388 miles.  (Hickey Decl. 16:22–25.)

48.    Captain Pancho was the master of the Captain T LE on the night of October 1, 2008, and morning of October 2, 2008.  (Stipulated Fact No. 30.)

49.    Captain Pancho did not see the Bayliner crossing ahead of the Captain T LE visually or on radar.  (Stipulated Fact No. 31.)

50.    Captain Raymond Blakeslee was the Captain T LE's engineer and lookout on the night of October 1, 2008 and morning of October 2, 2008.  (Stipulated Fact No. 32.)

51.    Captain Raymond Blakeslee did not see the Bayliner crossing ahead of the Captain T LE visually.  (Stipulated Fact No. 33.)

52.    Captain Pancho had his radar set to one–mile range during the transit out of the Los Angeles/Long Beach Port.  (Stipulated Fact No. 34.)

53.    The crew's ability to observe other traffic was not affected by background lighting from the Port of Los Angeles/Long Beach.  (Hickey Decl. 17:14–16; Johnson Decl. 11:14–16.)

**E.    THE COLLISION**

54.    The collision between the ISLANDER and a recreational boat with two people on board (Henry Sanchez and Penny Avila) occurred on the morning of October 2, 2008 at 12:18 a.m., at position 33.6527 degrees North latitude, 118.2319 degrees West longitude ("the Collision").  (Stipulated Fact No. 38; Hickey Decl. 12:4–6.)

55.    Between 4:00 and 4:30 p.m. on October 1, 2008, the tug REBEL II and the barge ISLANDER departed the Catalina Freight Lines facility in the Port of Los Angeles, California bound for Catalina Island.  (Stipulated Fact No. 19.)

56.    There were two crew members, Captain Scoto and Deckhand Amstutz, on the tug REBEL II during the transit to and from Catalina Island on October 1 and 2, 2008. (Stipulated Fact No. 8.)

57.    Deckhand Amstutz's duties during the voyage between Catalina Island and the Port of Los Angeles included checking the tow wire to be sure it was not slipping, conducting engine room checks, and performing lookout duties.  (Stipulated Fact No. 17.)

58.    Deckhand Amstutz performed his lookout duties from the lower wheelhouse of the tug REBEL II.  (Amstutz Decl. 4:4–6.)

59.    The tug REBEL II and barge ISLANDER departed from Catalina Island at approximately 9:55 p.m. on the night of October 1, 2008.  (Stipulated Fact No. 21.)

60.    The navigation lights on both the tug REBEL II and barge ISLANDER were on and in proper working order.  (Scoto Decl. 10:13–14; Amstutz Decl. 4:28–5:1.)

61.    The all–around white navigation lights on the tug REBEL II had a visible range of three miles, and the red and green (port and starboard) navigation lights on the barge ISLANDER had a visible range of two miles.  (Trial Transcript 309:4–10.)

62.    The weather for the return trip was clear and calm.  The seas consisted of an approximately one–foot slow swell of approximately thirty–second duration.  Visibility was at least six miles.  (Stipulated Fact No. 22.)

63.     The Vessel Traffic Service ("VTS") monitors the approaches to the port of LA/LB covering the waters 25 miles seaward of Point Fermin and includes Catalina Island. The tug REBEL II and barge ISLANDER were within this charted Vessel Traffic Management System during their entire transit to and from Catalina Island.  (Stipulated Fact No. 23.)

64.     The tug REBEL II checked in with VTS at 10:10 p.m. on October 1, 2008, when leaving Catalina Island en route to Los Angeles Port.  (Stipulated Fact No. 24.)

65.     At approximately 11:30 p.m. on October 1, 2008, Henry Sanchez and Penny Avila departed from a dock at 261 Bayshore Dr., in Alamitos Bay, Long Beach, CA in the Bayliner en route to Catalina Island.  (Stipulated Fact No. 26.)

66.     Henry Sanchez was the Bayliner's primary operator.  (Trial Transcript 110:2–4.)

67.     Avila saw Sanchez climb onto the Bayliner's bench seat and place an all-around white light on the canopy area of the boat near the radar dome.  When Sanchez put the light into its socket, Avila saw the white light illuminate.  Avila also saw from the dock that the Bayliner's red and green running lights (located toward the front of the boat) were illuminated.  (Avila Decl. 6:1-22.)

68.     On October 1, 2008, the Bayliner was equipped with a radar which was turned on.  (Avila Decl. 6:10–12.)

69.     The charted precautionary area outside Los Angeles and Long Beach harbor is an area of increased vessel traffic density and, as such, vessels are advised to "proceed with extreme caution" in the area.  (Stipulated Fact No. 28.)

70.     There were several thousand lights visible in the background of the tug REBEL II's approach to the Ports of Los Angeles/Long Beach, which made the identification of any one particular light source difficult.  (Scoto Decl. 11:16–22; Amstutz Decl. 6:3–9.)

71.     The background lighting on the approach of Buoy 1 toward the LA port is bright and can cause difficulties in observing lights from vessels on the water at night, but

-10-

such backscatter lighting decreases as one looks away from the LA/LB Port and would be less of a concern from the direction the Bayliner approached the REBEL II when compared to the LA/LB Port lights.  (Stipulated fact No. 69.)

72.    As the tug REBEL II approached the precautionary area, Captain Scoto switched the range on the radar from the six–mile setting to the three–mile setting and proceeded to adjust the gain and clutter for best clarity.  Captain Scoto did this to optimize the radar for detecting navigation buoys and also to detect anything else out there that may pose a concern to navigation.  (Scoto Decl. 11:23–12:1.)

73.    Upon entering the precautionary area, the tug REBEL II contacted VTS to revise their estimated time of arrival in port and for VTS to advise them of any traffic that might pose a concern to navigation.  (Scoto Decl. 12:5–8; Amstutz Decl. 4:21–25.)

74.    As the REBEL II was re-entering the precautionary area on the night in question, Captain Scoto was aware of the increased risks of collision which were presented by (1) the frequency of small boat traffic; (2) the fact that small boats were weak radar targets; (3) the backscatter lighting from the shore which caused difficulties in seeing small vessel traffic; and (4) the fact that small boats often ran without navigation lights.  (Trial transcript 37:20–23; 41:18–24; 44:19–45:22.)

75.    The increased risks noted above warranted increased vigilance in the performance of the lookout duties on the REBEL II as it traversed the precautionary area. (Trial Transcript 64:1–22; Declaration of Mitchell Stoller ("Stoller Decl.") 10:23–11:8, 15:10–17:11.)

76.    The tug REBEL II never received any information or communication from VTS that there was a small vessel in the area when the tug REBEL II entered the precautionary area outside Los Angeles and Long Beach harbor.  (Stipulated Fact No. 25; Scoto Decl. 12:9–12; Amstutz Decl. 6:14–17; Trial Transcript 39:5–7.)

77.    Captain Scoto was on watch on the starboard side of the lower wheelhouse in front of the tug REBEL II's radar as the tug REBEL II entered and transited through the precautionary area.  Deckhand Amstutz was posted as a dedicated lookout on the port side of

-11-

1   the lower wheelhouse as the tug REBEL II entered and transited through the precautionary

2   area.  (Scoto Decl. 12:13–16; Amstutz Decl. 6:18–22.)

3       78.     Captain Scoto's normal practice for maintaining a proper lookout, as was the

4   case on October 1–2, 2008, is to conduct both a visual lookout and to use the radar that is in

5   the lower wheelhouse of the tug REBEL II.  (Scoto Decl. 7:5–8.)

6       79.     Captain Scoto's normal practice in clear weather and calm seas, with good

7   visibility, as was the case on October 1–2, 2008, was generally two minutes scanning

8   visually and one minute observing radar.  (Scoto Decl. 7:9–12, 11:9–11.)

9       80.     The tug REBEL II was traveling at approximately 8 knots, and the Bayliner

10   was traveling at approximately 20 knots.  Given their relative angles of approach, the closing

11   speed of the vessels was 26.4 knots.  (Stipulated Fact Nos. 35 and 73.)

12       81.     The Bayliner maintained a straight–line course towards the Isthmus of

13   Catalina Island until it collided with the barge ISLANDER.  (Stipulated Fact No. 36.)

14       82.     At approximately two miles from the tug REBEL II/barge ISLANDER, the

15   Bayliner would have been approaching at 036 degrees from the tug REBEL II and

16   approximately 034 degrees from the barge ISLANDER.  (Stipulated Fact No. 70.)

17       83.     Captain Scoto and Deckhand Amstutz had an unobstructed line of sight from

18   inside the lower wheelhouse of the tug REBEL II to the Bayliner through the forward facing

19   windows as the Bayliner approached.  (Hickey Decl. 9:17–18.)

20       84.     Prior to the Collision, the Bayliner passed very close to Los Angeles Buoy No.

21   1.  (Stipulated Fact No. 37.)

22       85.     At a closing speed of 26.4 knots and a visibility range of two miles, the

23   all–around white navigation/anchor light on the Bayliner, was within visual range of the tug

24   REBEL II for at least four minutes and forty six seconds prior to the Collision.  (Hickey

25   Decl. 11:23–28.)

26       86.     Conversely, at a closing speed of 26.4 knots and a visibility range of three

27   miles, the all–around white navigation lights on the tug REBEL II were within visual range

28

of the Bayliner for an extra two minutes, being well over six minutes in total, prior to the Collision. (Trial Transcript 309:25–310:8.)

87.     Therefore, if the operators of the Bayliner and the REBEL II were able to see the other craft, the operators of the Bayliner would have had at least two minutes longer than the operators of the tug REBEL II to appreciate the risk of a collision.  (Trial Transcript 310:6–8.)

88.     The Bayliner was only not visible from the tug REBEL II's forward facing windows for about a 30 second period as it traversed from 036 degrees relative to the tug REBEL II to 180 degrees relative to the tug REBEL II and collided with the barge ISLANDER.  (Trial Transcript 311:16–18.)

89.     The Bayliner then struck the port bow rake of the barge ISLANDER, and was swept underneath the barge.  (Hickey Decl. 12:6–8.)

90.     At no time prior to the collision did the Bayliner alter speed or course. (Hickey Decl. 19:22–23, 29:21–23; Trial Transcript 171:13–15.)

91.     At the time of the collision, Henry Sanchez and Penny Avila were not on the deck of the Bayliner.  (Hickey Decl. 9:17–18.)

92.     At the time of the collision, Henry Sanchez and Penny Avila were not maintaining a proper lookout in violation of Rule 5 of the COLREGS.  (Stipulated Fact Nos. 5, 22, 28, 30–39, 44–46; Hickey Decl. 21:23–27, 22:6–7; Stoller Decl. 20:20–22.)

93.     At the time of the collision, the Bayliner did not have its red and green navigation lights turned on. (Johnson Decl. 10:27–11:6; Hickey Decl. 19:9–14; Trial Transcript 168:21–169:3.)

94.     At the time of the collision, the Bayliner was being operated, without a lookout and at a speed of 20 knots, in an area of converging vessel traffic, in violation of Rule 6 of the COLREGS.  (Hickey Decl. 22:8–10.)

95.     Prior to and at the time of the collision, the Bayliner's radar should have detected the tug REBEL II and barge ISLANDER, and alerted the Bayliner's operators that

1   something large and probably made of steel was in front of them.  (Trial Transcript
2   168:13–17, 172:1–10.)

3       96.     Prior to and at the time of the collision, because the tug REBEL II and the
4   barge ISLANDER had energized their navigation lights, the operators of the Bayliner could
5   and should have identified the tug REBEL II and the barge ISLANDER and taken steps to
6   avoid the collision.  (Stoller Decl. 20:18–20.)

7       97.     At the time of the collision, the tug REBEL II's radar was turned on and
8   functioning properly.  (Scoto Decl. 9:9–10.)

9       98.     Captain Scoto and Deckhand Amstutz were maintaining a proper lookout
10  pursuant to Rule 5 of the COLREGS.  Captain Scoto and Deckhand Amstutz were in their
11  customary positions in the lower wheelhouse to perform the necessary lookout duties.  The
12  captain and the deckhand were sharing lookout duties with the deckhand being the
13  designated lookout.  The deckhand had no other duties that would distract him from his
14  ability to maintain a proper lookout.  (Hickey Decl. 24:12–20, 24:24–27, 27:19–28:1;
15  Johnson Decl. 7:23–8:13.)

16      99.     Although Captain Scoto monitored the radar and visually scanned for lights
17  and targets, he was not able to acquire the Bayliner during its rapid approach toward the
18  barge ISLANDER.  Captain Scoto had to utilize his radar for navigation purposes as well as
19  target acquisition and collision avoidance. (Johnson Decl. 8:14–22.)

20      100.    Captain Scoto and Deckhand Amstutz did not become aware of the presence
21  of the Bayliner visually or on radar at any time before the collision, thus a crossing situation
22  under the COLREGS did not arise.  (Trial Transcript 162:9–13.)

23      101.    When a collision occurs in the area covered by VTS, VTS generates an
24  incident report.  Such a report was generated for the collision between the ISLANDER and
25  the Bayliner.  (Avila's Exhibit No. 281 at 7 ¶ 1.4.9.)

26      102.    The VTS incident report for the collision indicates that the collision occurred
27  .32 nautical miles from Los Angeles Buoy 1 with the REBEL II proceeding at 8.1 knots and
28  the Bayliner proceeding at 20 knots.  (Avila's Exhibit No. 281 at 7 ¶ 1.4.10.)

103. An examination of the ISLANDER following the collision indicated that the collision was likely a very strong, hard impact. (Avila's Exhibit No. 281 at 10 ¶ 1.7.5.)

104. Neither Captain Scoto nor Deckhand Amstutz ever became aware of the presence of the Bayliner at any time before, during, or the period after the collision between the REBEL II/ ISLANDER and the Bayliner. (Stipulated Fact No. 75.)

105. Immediately after the Collision, the Bayliner capsized, but remained afloat for 19 minutes before sinking, after which the Bayliner sat on the ocean floor, keel up, for seven days before it was recovered and brought to the surface. (Hickey Decl. 18:19–20; Stipulated Fact No. 76.)

**F. THE RECOVERY OF THE BAYLINER**

106. Divers discovered the location of the Bayliner on October 7, 2008, and the Bayliner was floated to the surface on October 8, 2008. (Stipulated Fact Nos. 78 and 79.)

107. When the Bayliner was recovered, the bodies of Penny Avila and Henry Sanchez were found within the wreckage of the sunken Bayliner. (Plaintiffs-in-Limitation's Exhibit Nos. 11 at 5, 30, 41 & 45; 12 at 24 & 27; and 44 at 4.)

108. Penny Avila's autopsy shows that her heart contained 1.1 micrograms/ml of Tramadol, and that she had a blood alcohol level of approximately 0.14 at the time of her death. (Plaintiffs-in-Limitation's Exhibit No. 11 at 44.)

109. When the Bayliner was recovered, it was found with its navigation light switch in the ANC position. (Johnson Decl. 10:27–11:6; Hickey Decl. 19:9–14.)

110. When the Bayliner was recovered, its steering wheel was found to have been locked–out with a make–shift "auto–pilot" that prevented the wheel from turning more than 2–3 degrees. (Stipulated Fact No. 45; Plaintiffs-in-Limitation's Exhibit No. 36.)

111. The damage to the Bayliner as a result of the collision was significant, and the entire top, including the operator's seat, was sheared off. (Stipulated Fact No. 46; Plaintiffs-in-Limitation's Exhibit No. 10.)

112.    On the morning of October 2, 2008, Captain Scoto and Deckhand Amstutz were administered drug and alcohol tests by the United States Coast Guard, the results of which were all negative.  (Stipulated Fact No. 77.)

113.    On the morning of October 2, 2008, the United States Coast Guard verified that the navigation lights on the barge ISLANDER were in working order.  (Trial Transcript 167:11–168:2.)

114.    Both Penny Avila and Henry Sanchez died of "probable drowning" and other unestablished factors on October 2, 2008.  (Stipulated Fact No. 44.)

## II.    CONCLUSIONS OF LAW

### A.    JURISDICTION

1.    Jurisdiction in this Court is pursuant to federal admiralty and maritime jurisdiction under 28 U.S.C. § 1333 and Rule F of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions of the Federal Rules of Civil Procedure ("Supplemental Rules.")

### B.    VENUE

2.    Venue is proper in this judicial district pursuant to Rule F(9) of the Supplemental Rules as Avila sued Plaintiffs-in-Limitation for claims, regarding which Plaintiffs-in-Limitation seek exoneration from or limitation of their liability, in the Superior Court of the State of California for the County of Los Angeles, case No. NC043730, which lies in this district, before Plaintiffs-in-Limitation filed this action.

### C.  AVILA'S DOHSA CLAIM — LIABILITY

3.    Avila's only claim is a statutory claim for damages under the Death on the High Seas Act ("DOHSA"), 46 U.S.C. §§ 30302 et seq., against Plaintiffs-in-Limitation.

4.    Avila brought his DOHSA claim within the three–year statute of limitations under DOHSA (46 U.S.C. § 30106.), even though the statute of limitations on Avila's DOHSA claim expired on October 2, 2011, and he was not appointed as the personal representative of the estate of Penny Avila until November 9, 2011.  Claimants filed the Answer and Claim before the statute of limitations ran, and Avila cured the real party in

-16-

interest issue within a reasonable time.  As the personal representative of the estate of Penny Avila, Avila has standing to assert this claim.  <u>See</u> Court's February 23, 2012 Minute Order. (Docket No. 80.)

5.      "When the death of an individual is caused by wrongful act, neglect, or default occurring on the high seas beyond 3 nautical miles from the shore of the United States, the personal representative of the decedent may bring a civil action in admiralty against the person or vessel responsible.  The action shall be for the exclusive benefit of the decedent's spouse, parent, child, or dependent relative." 46 U.S.C. § 30302.

6.      Collision liability is based on fault.  Negligence must be shown before liability is imposed. <u>In re Complaint of McLinn</u>, 744 F.2d 677, 680 (9th Cir. 1984); <u>Bernert Towboat Co. v. USS Chandler</u>, 666 F. Supp. 1454, 1456–57 (D. Or. 1987).  The standard of care in collision cases is provided by the concept of reasonable care, specific statutory provisions, and by the requirements of good seamanship.  <u>Bernert Towboat Co.</u> at 1457.

7.      "'[W]hen two or more parties have contributed by their fault to cause damage in a maritime collision . . ., liability for such damage is to be allocated among the parties proportionately to the comparative degrees of their respective fault. . . .'" <u>Exxon Co. v. Sofec, Inc.</u>, 54 F.3d 570, 573 (9th Cir. 1995) (quoting <u>United States v. Reliable Transfer Co.</u>, 421 U.S. 397, 411 (1975)); <u>Crowley Marine Servs. v. Maritrans Inc.</u>, 447 F.3d 719, 724–25 (9th Cir. 2006).

8.      The Court finds that Captain Olimpio Scoto and Deckhand John Amstutz, the crew of the tug REBEL II, were not at fault.  Avila failed to meet his burden of establishing that Penny Avila's death was caused by the wrongful act, neglect or default of the crew because, at all material times, the crew maintained a proper lookout and traveled at a reasonable speed of 8 knots.  Specifically, substantial evidence demonstrates that:

(a.)     Captain Scoto and Deckhand Amstutz were maintaining a proper visual lookout from the lower wheelhouse of the tug REBEL II;

(b.)     Captain Scoto was properly monitoring and optimizing the radar on the tug REBEL II for both navigation and collision avoidance;

-17-

(c.)   the relatively small Bayliner would have been difficult to see on radar because its image is lost in the "sea scatter" given that it has a poor radar signature because it is made of fiberglass and is not fitted with radar reflectors; and

(d.)   the Bayliner would have been difficult to see with the naked eye because it was improperly lit without its navigation lights energized; it was approaching at a speed of 20 knots directly from Los Angeles Buoy No. 1 (which is itself lit) on a night with no moonlight; and there would have been significant background lighting from the lights and reflections in the harbor and from the shore along the direction of the approaching Bayliner.

9.   Avila did not meet his burden of establishing that Plaintiffs-in-Limitation are liable for the collision based upon the negligent hiring of the crew.  Specifically, substantial evidence demonstrates that:

(a)   Plaintiffs-in-Limitation reasonably determined that Captain Scoto was suitably qualified and experienced to operate the tug REBEL II;

(b)   Plaintiffs-in-Limitation reasonably determined that Deckhand Amstutz was suitably experienced to undertake duties as a lookout on the tug REBEL II;

(c)   Plaintiffs-in-Limitation made reasonable enquiry into the qualifications and experience of Captain Scoto and John Amstutz to operate the tug REBEL II;

(d)   Plaintiffs-in-Limitation received no complaints about Captain Scoto's competence to operate the tug REBEL II at any time;

(e)   Captain Scoto and Deckhand Amstutz were maintaining a proper visual lookout from the lower wheelhouse of the tug REBEL II; and

(f)   Captain Scoto was properly monitoring and optimizing the radar on the tug REBEL II for both navigation and collision avoidance, and

-18-

1  operating the REBEL II at a reasonable speed of 8 knots at all material

2  times.

3       10.    Plaintiffs-in-Limitation, as the owners of the Rebel II, failed to provide radar

4  compliant with federal law.  Substantial evidence shows that the REBEL II violated a

5  federal statute, 33 CFR 164.72, and rules provided in the International Regulations for the

6  Prevention of Collisions at Sea, 33 U.S.C. §§ 1601–1608 ("COLREGS").

7       11.    Under The Pennsylvania Rule, the breach of the federal statute relating to the

8  minimum standards for radar equipment operates to shift the burden of proof to Plaintiffs-in-

9  Limitation to prove that said violation could not have caused or contributed to the collision.

10  The Pennsylvania, 86 US (19 Wall) 125, 22 L. Ed. 148 (1873).

11       12.    The Ninth Circuit has held that "the burden imposed under The Pennsylvania

12  rule is discharged by a clear and convincing showing of no proximate cause, rather than the

13  stricter test of beyond a reasonable doubt.  Pacific Tow, 276 F.2d at 749 ("The words 'could

14  not have,' as used in [The Pennsylvania] rule, do not require the vessel guilty of a statutory

15  fault to prove that its fault could not by any stretch of the imagination have had any causal

16  relation to the collision no matter how speculative, improbable, or remote.")  Clear and

17  convincing evidence suffices for a showing in satisfaction of The Pennsylvania rule."

18  Trinidad Corp. v. S.S. Keiyoh Maru, 845 F.2d 818, 825 (9th Cir. 1988).

19       13.    The Furuno model 1832 radar set aboard the tug REBEL II on October 1-2,

20  2008, was capable of detecting a replica Bayliner during a recreation on the 3-mile range

21  scale at exactly the same time as a radar compliant with 33 CFR 164.71(ii)(B). (See: Pecota

22  Decl. 5:9-17; 6:2-10.)  The non-compliance of the Furuno model 1832 radar set is not

23  causative of the collision.

24       14.    Plaintiffs-in-Limitation demonstrated by clear and convincing evidence that

25  the non-compliant radar was not a proximate cause of the collision.

26       15.    The Court finds that the operators of the Bayliner were the cause of the

27  collision, because substantial evidence shows that the operators of the Bayliner violated

28  rules provided in the COLREGS.  Specifically, the operators of the Bayliner:

(a)   allowed the Bayliner to travel at an unsafe speed of 20 knots, at night, with no one at the controls, with no effective monitoring of the Bayliner's radar, with no navigation lights energized, and with no radar reflectors fitted in breach of COLREGS—Rule 6;

(b)   failed to maintain a proper lookout, failed to alter course or speed prior to the Collision, and passed directly in front of the Captain T LE at a range of approximately 0.388 miles while traveling at 20 knots, and nearly missed Los Angeles Buoy No. 1 in breach of COLREGS— Rule 5; and

(c)   allowed the Bayliner's steering wheel to be locked out with an improvised friction lock that prevented the Bayliner from turning in breach of COLREGS– Rule 2.

16.   These violations of the COLREGS by the operators of the Bayliner were contributing causes of the collision.  The operators of the Bayliner were liable for the collision.

**D.  AVILA'S DOHSA CLAIM — DAMAGES**

17.   The amount of recoverable damage under DOHSA is set forth in 46 U.S.C.A. § 30303: "The recovery in an action under this chapter shall be a fair compensation for the pecuniary loss sustained by the individuals for whose benefit the action is brought."

18.   Under DOHSA, damages are limited to pecuniary losses.  Howard v. Carnival Cruises, Inc., 41 F.3d 527, 530 (9th Cir. 1994).  The amount of recovery is thus limited to the amount of actual pecuniary benefits the beneficiary could have reasonably expected to receive from the continued life of the decedent.  Dugas v. Nat'l Aircraft Corp., 438 F.2d 1386, 1392 (3d Cir. 1981).

19.   Since the Court finds that Plaintiffs-in-Limitation and Crew Claimants have no liability for the Collision, Avila may not recover any damages under DOHSA.

1

2

**E.      PLAINTIFFS–IN–LIMITATION'S CLAIM FOR EXONERATION FROM OR LIMITATION OF LIABILITY**

3        20.     "[A] determination of whether a shipowner is entitled to limit his liability

4    involves a two-step analysis. . . . 'First, the court must determine what acts of negligence or

5    conditions of unseaworthiness caused the accident.  Second, the court must determine

6    whether the shipowner had knowledge or privity of those same acts of negligence or

7    conditions of unseaworthiness.'  Moreover, once a claimant satisfies the initial burden of

8    proving negligence or unseaworthiness, the burden of proof shifts to the shipowner to prove

9    the lack of privity or knowledge." <u>Hercules Carriers, Inc., v. Claimant State of Florida</u>, 768

10   F.2d 1558, 1563–64 (11th Cir. 1985) (quoting <u>Farrell Lines, Inc. v. Jones</u>, 530 F.2d 7, 10

11   (5th Cir. 1976); <u>see also</u> <u>Bankers Trust Co., v. Bethlehem Steel</u>, 761 F.2d 943, 948 (3rd Cir.

12   1985).

13       21.     Since the Court finds that no acts of negligence or conditions of

14   unseaworthiness by the tug REBEL II or its crew caused the accident, the Court need not

15   determine whether Plaintiffs-in-Limitation are entitled to a limitation of liability under the

16   Limitation of Liability Act ("LOLA"), 46 U.S.C. § 30501 et seq.  The Court also does not

17   need to determine whether Plaintiffs-in-Limitation would have been entitled to claim

18   exoneration from liability for the collision under LOLA.

19

20

**F.      PLAINTIFFS–IN–LIMITATION'S CLAIM FOR NEGLIGENT ENTRUSTMENT**

21       22.     While Plaintiffs-in-Limitation have demonstrated that the Bayliner was owned

22   by Avila, they have not demonstrated that Avila negligently entrusted the Bayliner to either

23   Henry Sanchez or Penny Avila, nor have they demonstrated that Avila knew or had reason

24   to know that either of these operators was likely to use the Bayliner in a manner involving

25   unreasonable risk of harm.  Plaintiffs-in-Limitation failed to prove (a) that Avila knew or

26   should have known that Sanchez would operate the Bayliner at an unsafe speed, (b) that

27   Avila knew or should have known that Sanchez would not maintain a proper lookout or

28

1  effectively monitor the radar, or (c) that Avila knew or should have known that Sanchez

2  would use the steering wheel lock on the Bayliner.

3                                    **CONCLUSION**

4        For the foregoing reasons, the Court finds that neither Crew Claimants nor Plaintiffs-

5  in-Limitation have any liability for the collision.  Accordingly, the Court will enter judgment

6  in favor of Plaintiffs-in-Limitation.

7  March 7, 2013

8                                        _____

9                                              Percy Anderson
                                         UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                         -22-